Millard **VAUGHN** and Barbara **Vaughn, Appellants,**

v.

Paul **DRENNON** and Mary **Drennon, Appellees.**

No. 12–05–00223–CV.

Court of Appeals of Texas, Tyler.

July 19, 2006.

Rehearing Overruled Aug. 30, 2006.

---

7. *See* Tex.R.App. P. 47.1.

Clayton E. Dark, Jr., Law Office of Clayton E. Dark, Jr., Lufkin, Darrin Walker, for appellants.

Jeffrey D. Adams, John H. Seale, Seale, Stover & Bisbey, Jasper, for appellees.

Panel consisted of WORTHEN, C.J. and GRIFFITH, J.

## OPINION

SAM GRIFFITH, Justice.

Millard and Barbara Vaughn appeal from a permanent injunction entered against them in a suit filed by their neighbors, Paul and Mary Drennon, involving damages caused by water runoff and Millard Vaughn's unneighborly behavior. The Vaughns complain of the breadth and lack of specificity of the order as well as a lack of evidence to support it. We reverse in part and affirm in part.

### BACKGROUND

The Drennons purchased a one half acre lot in Sabine County in 1972, began building the house in 1975, and made it their permanent residence in 1982. That property shares a boundary with property purchased by the Vaughns in 1995. The property owned by the Vaughns is higher in elevation. Additionally, Millard Vaughn made some changes to the topography of his property near its boundary with the Drennon property. Consequently, water drains from the Vaughn property onto the Drennon property. On December 7, 2004, after finding water damage to their property, the Drennons filed suit alleging nuisance, intentional infliction of emotional distress, and invasion of privacy. At the same time, the Drennons sought a temporary restraining order and a temporary injunction. On the same day, the trial court issued a temporary restraining order immediately restraining the Vaughns from:

a. damaging or destroying the Drennons' personal property;

b. damaging or destroying the Drennons' real estate;

c. threatening or harassing the Drennons;

d. coming within 75 feet of the Drennons at any time;

e. continuing work of any kind on the Vaughns' real property pending final disposition of this matter;

f. communicating with the Drennons in any manner;

g. causing bodily harm to the Drennons;

h. destroying, disposing of, or altering any prior communication with the Drennons;

i. instituting any action in any other county, state, or nation attempting to obtain temporary or permanent orders concerning the same factual and legal scenario contained within this lawsuit; and/or

j. disturbing the Drennons' peace.

On March 3, 2005, after a hearing, the trial court issued a temporary injunction enjoining Millard Vaughn from all of the acts prohibited by the temporary restraining order except it restricted Vaughn's work on his property in an area within 200 feet of the Drennons' property line and it omitted the provision prohibiting Vaughn from filing suit. The trial court denied the temporary injunction as to Barbara Vaughn. After a trial before the court the next month, the court permanently enjoined Millard and Barbara Vaughn from all the acts prohibited by the temporary injunction except the final judgment omitted the restriction from working on the Vaughns' property. The judgment ordered the Vaughns to "lower the elevation of their land between eight (8) feet and twenty (20) feet east of Defendants' west boundary line at least three (3) feet wide, the bottom of which to be eighteen (18) inches lower in elevation than that of the land along Defendants' west boundary line perpendicular thereto." Also, the court awarded the Drennons $4,000.00 for actual damages and $3,000.00 for punitive damages.

### APPLICABLE LAW

■ Whether to grant a permanent injunction is ordinarily within the sound discretion of the trial court and, on appeal, review of the trial court's action is limited to the question of whether the action constituted a clear abuse of discretion. *Computek Computer & Office Supplies, Inc. v. Walton,* 156 S.W.3d 217, 220 (Tex.App.-Dallas 2005, no pet.). Because an injunction is an equitable remedy, a trial court weighs the respective conveniences and hardships of the parties and balances the equities. *Id.* Injunctive relief may be granted only on a showing of a wrongful act, imminent harm, irreparable injury, and the absence of an adequate remedy at law. *Priest v. Texas Animal Health Comm'n,* 780 S.W.2d 874, 875 (Tex.App.-Dallas 1989, no writ).

■ An injunction should be broad enough to prevent a repetition of the evil sought to be corrected. *Hitt v. Mabry,* 687 S.W.2d 791, 795 (Tex.App.-San Antonio 1985, no writ). However, it must not be so broad as to enjoin a defendant from activities that are a lawful and proper exercise of his rights. *Id.* at 796. Although an injunction is a preventative device, injunctive relief is improper where the party seeking the injunction has mere fear or apprehension of the possibility of injury. *Frey v. DeCordova Bend Estates Owners Ass'n,* 647 S.W.2d 246, 248 (Tex.1983). A prerequisite for injunctive relief is actual injury, the threat of imminent harm, or another's demonstrable intent to do that for which injunctive relief is sought. *Tri-State Pipe and Equip., Inc. v. Southern County Mut. Ins. Co.,* 8 S.W.3d 394, 401 (Tex.App.-Texarkana 1999, pet. denied).

■ The owner of higher property is entitled to have water pass to lower land

as long as the water follows its usual course untouched by human hands. *Bunch v. Thomas,* 121 Tex. 225, 232, 49 S.W.2d 421, 424 (1932). If a party diverts water onto the land of another in a manner causing him injury, the party doing so is liable for damages. TEX. WATER CODE ANN. § 11.086(a) (Vernon 2000); *Dietrich v. Goodman,* 123 S.W.3d 413, 418 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

### ELEVATION OF VAUGHNS' PROPERTY

In their first issue, the Vaughns assert that by ordering them to alter the natural slope of their property, the trial court granted relief beyond that prayed for by the Drennons and infringed on the Vaughns' right to have the water drain off their property in its natural state. In their second issue, the Vaughns contend that this requirement is too vague.

### Relief Prayed For

A trial court may not grant relief in the absence of pleadings supporting such relief. *Holmstrom v. Lee,* 26 S.W.3d 526, 532 (Tex.App.-Austin 2000, no pet.). The purpose of pleadings is to give the parties notice of claims, defenses, and relief sought. *See Perez v. Briercroft Serv. Corp.,* 809 S.W.2d 216, 218 (Tex. 1991). A prayer must be consistent with the facts stated as a basis for relief. *Kissman v. Bendix Home Sys., Inc.,* 587 S.W.2d 675, 677 (Tex.1979). Even though a party requests special relief, if he also includes a prayer for general relief, he may be awarded the relief to which he is entitled under his pleadings and the evidence. *Pennsylvania Ins. Co. v. Storbeck & Gregory,* 391 S.W.2d 811, 813 (Tex.App.-Fort Worth 1965, no writ).

### Petition

In their petition, the Drennons alleged that the Vaughns "cleared and removed trees and all undergrowth from the property, bulldozed and tilled the soil, and altered the natural slope of land, thus negatively affecting the natural drainage of surface water." They further alleged that the Vaughns constructed dams that act as a funnel increasing the speed of, and concentrating, rain and other surface water runoff from the Vaughns' property onto the Drennons' property. The Drennons asked the court to enjoin and restrain the Vaughns from committing the acts described in the petition. They also prayed "[f]or such other and further relief, both at law or in equity, to which Plaintiffs may be justly entitled." In other words, the Drennons asked the court to make the Vaughns stop directing the flow of water onto the Drennons' property.

### Evidence

Paul Drennon testified that he has had "surface water problems" since he bought the property. Rain water has been flowing onto his property from the property now owned by the Vaughns since the 1980s. Until 2004, ditches adequately prevented a water problem. Before the Vaughns purchased the property, Drennon and some neighbors installed a pipe that ran across his property and onto what is now the Vaughns' property. That pipe drained water that came off the Vaughns' property onto the Drennons' property, depositing it on a lower part of the Vaughns' property. From there it flowed to the lake. Drennon believed a neighbor had gotten permission from the previous owner to divert the water onto that property. After Vaughn bought the property, he removed that pipe. Drennon has run a pipe into the culvert in the road in front of his house to drain water. Drennon also has ditches on his property diverting water. Drennon testified that Vaughn had allowed him to dig a ditch on the Vaughns' property parallel to the common fence so the

water would run down the hill and into the lake. However, Vaughn did not allow Drennon to maintain the ditch, and it filled in.

Harold Crocker, who lives three houses from Drennon, testified that, before the Vaughns purchased their property, he helped lay the pipe on the Drennons' property that deposited water draining from the Vaughns' property back onto the Vaughns' property. At the same time, he dug a ditch along the back of the Vaughn property to protect the Drennon property and their next door neighbor. In the summer of 2004, Vaughn removed trees from a portion of his property, clearing out a twenty-five to thirty foot area from the top of the hill down to the chain link fence marking the Vaughn/Drennon property line. Also, Vaughn built four or five dirt dams behind the Drennons' fence that funneled water into the Drennons' yard. He also placed timbers perpendicular to the fence, which helped funnel more water onto the Drennons' property and sped up the velocity of the water.

When cross examining Drennon, the Vaughns' attorney asked him what he wanted the judge to do in this case. Drennon responded that he wanted the judge to correct this problem, he wanted the dirt and timbers removed, and he wanted "it fixed where the water won't run off that hill down there and back onto [his] property." He wanted whatever it takes to stop the water from being funneled across his property and "whatever it takes to fix it." Dwayne Husband, an employee of the Sabine River Authority, testified that it would help if Vaughn removed some of the structures he has erected on his property, and they need a drainage ditch to stop the water from coming across the Drennons' property. He said the water needs to be diverted.

William Tatum, who owns a home near the Drennons' and the Vaughns' properties, testified that Vaughn built two levies to divert water to flow through the Drennons' backyard, and removal of those levies would reduce the volume or velocity of water coming off the Vaughns' property onto the Drennons' property. He agreed with counsel for the Vaughns that if the Drennons put a ditch at the back of their property and brought it around between their house and their next door neighbor's house, it would alleviate some of the problem.

Mary Drennon testified that she wanted the dams and dirt moved and she wanted it "fixed where there will never be any-more flooding on [her] property or in [her] home again." She explained that the ditch they put on their property does no good, but if Vaughn removes the dams and puts the soil back like it was, then he could put a ditch or retaining wall on his property to hold the water on his property. She stated that there needs to be some kind of construction, such as culverts or ditches, behind their property, that is permanent and continuously maintained. She admitted knowing nothing about "dirt work" but wanted "whatever it would take" to permanently eliminate the flooding.

Earnest Vaughn, Millard's brother, lives across the street from the Drennons. He testified that a ditch on his brother's property behind the Drennons' property would divert water to the property owned by the McGees, who live next door to the Drennons. If a ditch were dug down to the McGee property, the water would drain onto the Crocker property. He explained, "[W]hen you put a ditch in, that's sandy loam up there, a small amount of water you can bury a truck in that sucker over-night." In other words, because the soil is sandy, a ditch will be eroded out, not filled in.

Millard Vaughn testified that, in 1996 or 1997, after Drennon requested to till a ditch on the Vaughns' property to divert water, Vaughn dug a ditch. It was two feet wide, running the whole length of the Drennons' property, one hundred fifty feet. Then he turned it and brought it into his property another one hundred fifty feet so the ditch would not carry water to McGee's or Crocker's property.

## Discussion

The Drennons wanted the dams removed so that Vaughn was not deliberately diverting water onto their property. They also wanted the problem of excess runoff permanently corrected. The pleadings and evidence support the trial court's order that the Vaughns lower the elevation of their land along their west boundary line. *See Kissman,* 587 S.W.2d at 677; *Pennsylvania Ins. Co.,* 391 S.W.2d at 813. In their brief, under their argument for issue three, the Vaughns concede that "the trial court could have reasonably found that Millard Vaughn diverted the surface water on his property in such a manner that it flowed onto the Drennons' property in a manner that was not 'natural,' justifying an injunction designed to restore the water to its natural flow."

The Vaughns argue that the requirement to lower the elevation of their land is an order to alter the natural flow of water off their land and infringes on their right to have surface water drain in its natural state onto lower estates. The Drennons respond that the trial court was merely attempting to restore the natural condition of the land prior to the Vaughns' actions.

The trial court ordered the Vaughns to lower the elevation of their land along the east/west boundary shared with the Drennons by eighteen inches. This is consistent with Mary Drennon's testimony that Vaughn had piled dirt against their gate eighteen inches tall. The petition complained of the Vaughns' acts of redirecting the flow of water and included a prayer for general relief. The evidence supports the petition. Therefore, the court did not grant relief beyond that prayed for. *See Pennsylvania Ins. Co.,* 391 S.W.2d at 813. Because the effect of the court's order to lower the elevation of their land is to re-create the natural flow of water as it was before Vaughn changed the natural flow, the trial court's order does not infringe on the Vaughns' right to have surface water drain onto the Drennons' property. *See Bunch,* 121 Tex. at 232, 49 S.W.2d at 424. The trial court did not enjoin the Vaughns from engaging in lawful activities by having them restore the natural condition of the land. *See Hitt,* 687 S.W.2d at 796. The trial court did not abuse its discretion in granting this injunctive relief. *See Walton,* 156 S.W.3d at 220. We overrule the Vaughns' first issue.

### Vagueness

The Vaughns assert that the portion of the order requiring them to lower the elevation of their land should be stricken due to vagueness. They argue that the order does not describe with particularity the locations at which they must lower the elevation of their property. In support of this argument, they rely on Rule of Procedure 683, which requires a description "in reasonable detail" of the act sought to be restrained.

An injunction must be definite, clear, and concise, leaving the person enjoined in no doubt about his duties, and should not be such as would call on him for interpretations, inferences, or conclusions. *Gulf Oil Corp. v. Walton,* 317 S.W.2d 260, 264 (Tex.Civ.App.-El Paso 1958, no writ).

The complained of paragraph states:

ADDITIONALLY, the Court ORDERS that Defendants Millard Vaughn and Barbara Vaughn lower the elevation

of their land between eight (8) feet and twenty (20) feet east of Defendants' west boundary line at least three (3) feet wide, the bottom of which to be eighteen (18) inches lower in elevation than that of the land along Defendants' west boundary line perpendicular thereto.

The trial court ordered the Vaughns to lower the elevation of their land at some distance east of the Vaughns' west boundary line. Possibly, the phrase "between eight (8) feet and twenty (20) feet" means that the digging should be done at least eight feet east of the boundary but no more than twenty feet east of the boundary. But we are not allowed to use conjecture. *See id.* The lowered area is to be three feet wide and eighteen inches deep. Considering that the timbers which must be removed are perpendicular to the boundary, it is difficult to understand how lowering the elevation in a manner that is perpendicular to the boundary could be helpful. The phrase "perpendicular thereto" is confusing. The order is not clear and does not contain sufficient detail for the Vaughns to determine exactly what the court wants them to do. *See* TEX.R. CIV. P. 683; *Walton,* 317 S.W.2d at 264. We sustain the Vaughns' second issue.

### PROHIBITIONS CONCERNING DISTANCE, DISTURBING THE PEACE, THREATS, AND COMMUNICATIONS

In their third issue, the Vaughns assert that the trial court's prohibitions against their coming within seventy five feet of the Drennons, disturbing the peace of the Drennons, and threatening or harassing the Drennons are unsupported in the evidence. They argue that there is no evidence that Barbara Vaughn did anything or that Paul Drennon was harassed or intimidated. They further argue there is no evidence of intentional infliction of emotional distress and neither pleadings nor evidence of invasion of privacy. In their fourth issue, they assert that the injunction's prohibitions against disturbing the peace and threatening or harassing are too vague. In their fifth issue, the Vaughns contend that, because there is no evidence that they committed intentional infliction of emotional distress or invasion of privacy, there is no civil wrong to underlie the portions of the injunction relating to communications and they should be stricken. In their seventh issue, the Vaughns assert that Barbara Vaughn did not do anything to the Drennons or commit any tort and therefore the judgment against her should be reversed.

### *Standard of Review*

If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In reviewing no evidence issues, the reviewing court views the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). The reviewing court must credit evidence that supports the verdict if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. We must determine whether the evidence at trial would enable a reasonable and fair minded person to find the facts at issue. *Id.* The fact finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. A challenge to the legal sufficiency of evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. *Kroger Tex. Ltd. P'ship v. Suberu,* —— S.W.3d ——, ——, 2006 WL 1195331, 49 Tex. Sup.Ct. J. 592, 2006 Tex.

Lexis 441, at *9 (Tex. May 5, 2006). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Id.*

### Evidence

Paul Drennon testified that Millard Vaughn harassed them "continuously since this all started; some almost everyday." He said Vaughn watched them. Vaughn sat across the road in a truck and watched their window with binoculars. Vaughn removed a pipe that ran from the Drennons' property onto the Vaughns' property. That pipe had been placed there prior to the time the Vaughns purchased the property, for the purpose of draining water off the Drennons' property that had originated from the Vaughns' property.

Paul Drennon testified that he did not know of anything Barbara Vaughn had done to cause any damages and that she had done nothing physically. He thinks she knew what was going on because she is married to Vaughn and is involved in some way. He believes she probably did some typing, but he cannot say for sure what she did.

Mary Drennon testified that Vaughn would sit in front of their house for hours looking at them. He also looked at them through binoculars from his property and took pictures. This began in the latter part of October 2004. Because of his activities, Mary does not do much of anything outside anymore. She does not work in the garden or take walks. She fears going out on her porch. If she is outside and hears Vaughn's truck, she goes back inside. One day when she was walking, he stopped near her, and she saw guns in his truck. When she asked why he was carrying guns, he said he had them to shoot animals, varmints, birds that destroy his property, and people he does not like. She took this as a threat. This incident happened shortly after he told her not to walk down his road anymore, a request that led her to believe he did not like her anymore. At a later time when she was outside, he drove up, opened the door of his truck, and cleared his throat. She saw guns in his truck then. She testified that she is afraid of Millard Vaughn.

After a big rain in early December, Mary was taken to the hospital for treatment of an anxiety attack. She testified that Vaughn harassed her by driving by their house, parking out front with binoculars, and taking pictures. Mary also testified that Vaughn accused her of taking vegetables from his brother's garden and told her not to go to his brother's place anymore. For weeks, Vaughn watched them with binoculars. He looked directly in her kitchen window at her with binoculars.

She said she cannot function or take care of her husband's needs or her household needs. She has been deprived of her activity, her life, and her time. She can no longer do the things she had always done before because she is not functioning. She explained that she and Paul act "terrible" toward each other. They are short tempered, hostile, stressed out, no longer do things together, and cannot focus on anything. Mary testified that the stress made it terribly hard on Paul. He cannot do what he wants to do. He stays upset all the time. He is stressed by what has been done to his property and worries about what will happen next. Mary said she will always fear Millard, will never be the same person again, will never be able to do what she has always done, will never be free, and will never be Mary again.

Mary testified that Barbara has never been unkind to her, never said anything ugly to her, and did nothing to construct the dams. Mary also said Barbara did not carry guns, make threats, divert water,

harass them, or invade their privacy. Barbara typed an email and helped with the paperwork. Mary felt that Barbara knows about what Vaughn did and, because they are husband and wife, that Vaughn and Barbara are both responsible.

### Nuisance

■ An invasion of one's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water may constitute a private nuisance. *City of Princeton v. Abbott,* 792 S.W.2d 161, 166 (Tex.App.-Dallas 1990, writ ref'd n.r.e.) (op. on reh'g). The Drennons pleaded a cause of action for nuisance, complaining of Millard Vaughn's acts of moving dirt and building dams that caused water to run onto their property in damaging volumes. The evidence of nuisance is set out above. However, the court's order enjoining the Vaughns from threatening, harassing, coming within seventy-five feet of the Drennons, communicating with the Drennons, destroying prior communications, and disturbing the peace of the Drennons is not supported by evidence of nuisance. Further, neither Paul nor Mary Drennon testified as to any act by Barbara Vaughn constituting nuisance.

### Intentional Infliction of Emotional Distress

■ The elements of the tort of intentional infliction of emotional distress are 1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe. *Suberu,* —— S.W.3d at ——, 2006 WL 1195331, 49 Tex. Sup.Ct. J. 592, 2006 Tex. LEXIS 441, at *15. Courts must determine as a threshold matter whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Brew-*

*erton v. Dalrymple,* 997 S.W.2d 212, 216 (Tex.1999). To be extreme and outrageous, conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Id.* The test for determining what conduct is extreme and outrageous is essentially a subjective one. *Twyman v. Twyman,* 855 S.W.2d 619, 629 (Tex.1993) (Hecht, J., concurring and dissenting). Insensitive or rude behavior does not amount to outrageous behavior. *Haynes & Boone, L.L.P. v. Chason,* 81 S.W.3d 307, 309 (Tex.App.-Tyler 2001, pet. denied). Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the necessary level of extreme and outrageous conduct. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999). Courts consider the context and the relationship between the parties. *Chason,* 81 S.W.3d at 310.

■ Watching people, driving by their house, and taking pictures of their property are not beyond the bounds of decency, atrocious, or intolerable acts. *See Brewerton,* 997 S.W.2d at 216. Having guns visible in a vehicle in the manner set out above is not outrageous behavior. Millard Vaughn's behavior and the comment he made in response to Mary's question about the guns are insensitive and rude, but this does not amount to outrageous behavior. *See Bruce,* 998 S.W.2d at 612. Even if his actions can be considered threats, this conduct cannot be characterized as extreme and outrageous. *Id.* Neither Paul nor Mary Drennon provided evidence of extreme or outrageous conduct by Barbara Vaughn. Due to the absence of extreme and outrageous conduct, the record does not support a finding that either Millard or Barbara Vaughn is guilty of intentional

infliction of emotional distress. *See Brewerton*, 997 S.W.2d at 216.

### Invasion of Privacy

A common law right to privacy exists under Texas law. *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex.1973). The Texas Constitution guarantees the sanctity of the home and person from unreasonable intrusion. *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987). The elements that must be established for an invasion of privacy claim are (1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex.1993). When assessing the offensive nature of the invasion, courts further require the intrusion to be unjustified or unwarranted. *Billings*, 489 S.W.2d at 860. This type of invasion of privacy is generally associated with either a physical invasion of a person's property, eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying. *Clayton v. Wisener*, 190 S.W.3d 685, 696 (Tex.App.-Tyler 2005, pet. denied).

We will assume without deciding that the Drennons properly pleaded a cause of action for invasion of privacy. The Drennons complained that Millard Vaughn watched them through binoculars. There is no evidence that he entered their property or walked up to their house to look into the windows. Mary testified that Vaughn watched them from his own property and from his brother's house, which is across the street from the Drennons. She explained that her kitchen sink is by a big double window that looks out toward the front yard and the road. On one occasion, while she was standing there looking out, she saw Vaughn parked in his brother's driveway looking at her through the blinds with his binoculars. At other times, he watched them while they were outside. The core of the tort of invasion of privacy is the offense of prying into the private domain of another. *Clayton v. Richards*, 47 S.W.3d 149, 153 (Tex.App.-Texarkana 2001, pet. denied). One cannot expect to be entitled to seclusion when standing directly in front of a large window with the blinds open or while outside. Thus, the evidence does not show intrusions into the Drennons' seclusion or private affairs. The record does not support a finding that the Vaughns are guilty of invasion of privacy. *See Valenzuela*, 853 S.W.2d at 513.

### Judgment

There is no evidence that the Vaughns committed intentional infliction of emotional distress or invasion of privacy. *See Brewerton*, 997 S.W.2d at 216; *Valenzuela*, 853 S.W.2d at 513. These alleged causes of action cannot support the judgment's prohibitions against the Vaughns' coming within seventy five feet of the Drennons, disturbing the peace of the Drennons, communicating with the Drennons, tampering with any prior communications with the Drennons, and threatening or harassing the Drennons. Neither are these prohibitions supported by the nuisance cause of action as it is properly addressed by other portions of the judgment. Accordingly, we delete these prohibitions from the judgment. As there is no evidence that Barbara Vaughn engaged in any wrongdoing, she cannot be held liable for creating a nuisance or be required to pay actual damages. Because the judgment against Barbara for nuisance and actual damages is unsupported, the award against Barbara for exemplary damages cannot stand. *See Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex.

1993) (Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages.). We sustain the Vaughns' third issue to the extent it asserts there is no evidence of intentional infliction of emotional distress or invasion of privacy, their fifth issue to the extent it asserts there is no evidence to support the prohibitions regarding communications, and their seventh issue that asserts there is no evidence of any cause of action by Barbara Vaughn. We need not reach issue four. *See* TEX.R.APP. P. 47.1.

### REASONS FOR ISSUANCE

■ In their sixth issue, the Vaughns contend the injunction is void because it does not set forth the reasons for its issuance. They rely on Rule of Civil Procedure 683, which states that every order granting an injunction and every restraining order shall set forth the reasons for its issuance.

Although the rule does not specify, it has been held to apply only to temporary restraining orders and temporary injunctions, not permanent injunctions. *Qaddura v. Indo–European Foods, Inc.,* 141 S.W.3d 882, 892 (Tex.App.-Dallas 2004, pet.denied); *Shields v. State,* 27 S.W.3d 267, 273 (Tex.App.-Austin 2000, no pet.); *Alexander Schroeder Lumber Co. v. Corona,* 288 S.W.2d 829, 835 (Tex.Civ.App.-Galveston 1956, writ ref'd n.r.e.). The Vaughns have appealed a judgment ordering a permanent injunction. Therefore, the injunction is not void for failure to set forth the reasons for its issuance. We overrule the Vaughns' sixth issue.

### EXEMPLARY DAMAGES

In their eighth issue, the Vaughns assert that the evidence of malice or gross negligence is legally insufficient and cannot support the exemplary damages award. They argue that, while Millard Vaughn

intentionally created dams on his property knowing they would divert the water, there was only speculation that his motive in doing so was to flood the Drennons' property. They assert that a reasonable fact finder could not form a firm conviction that Millard Vaughn had a specific intent to cause substantial injury or harm to the Drennons. Further, they argue that a reasonable fact finder could not form a firm conviction or belief that Millard Vaughn's actions were objectively highly likely to result in great harm or that Millard Vaughn proceeded with actual subjective awareness of such a risk.

### *Applicable Law*

■ Exemplary damages may be recovered in an action for nuisance. *See Besso v. Southworth,* 71 Tex. 765, 769, 10 S.W. 523, 524 (1888). Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (Vernon Supp.2005). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(2) (Vernon Supp.2005). Malice means a specific intent by the defendant to cause substantial injury or harm to the claimant. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7). Specific intent means that the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it. *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex.1985). Gross negligence means an act or omission that, when viewed objectively from the standpoint of the actor at the time of its occur-

rence, involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others and of which the actor has actual, subjective awareness, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11). Gross negligence and malice may be proven by direct or circumstantial evidence. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994); *Behee v. Missouri Pac. Ry. Co.,* 71 Tex. 424, 429, 9 S.W. 449, 450 (Tex.1888).

The appellate court reviews all the evidence in the light most favorable to the finding, taking into account contrary undisputed facts, to determine whether a reasonable fact finder could have formed a firm belief or conviction regarding malice or gross negligence. *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004). The reviewing court must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could and disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* Where findings of fact and conclusions of law are not requested or filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory supported by the evidence. *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984).

### Evidence

The Drennons have lived on this property since 1982. They admitted that there had always been drainage problems on their property but never to the extent they encountered in the last part of 2004. Prior to this time, there had been ditches and pipes in place to carry away the excess water. In 1995, the year he bought his land, Vaughn removed a pipe that drained water off the Drennons' property onto his. In 1996, Vaughn first started moving dirt,

clearing land for the power right of way. In the process, he removed trees and lowered the ground behind the Drennons' property. In 1996 or 1997, Vaughn dug a ditch on his property for the Drennons' benefit, but it was not maintained. According to Mary, their friendship with the Vaughns had deteriorated by June 2004. On July 21, 2004, Vaughn first piled dirt on the Drennons' fence. In August 2004, Vaughn wanted the Drennons to remove trees on their property and dig ditches along the north and south fence lines. The Drennons refused. Vaughn told Crocker that if there were not going to be any ditches in the front, there would be no ditches in the back.

In August 2004, Vaughn did more dirt work behind the Drennons' property. During the fall, he started building dams and kept adding more dirt. In October, Vaughn accused the Drennons of dumping sewage on his property although he was never able to prove this claim. Mary testified that Vaughn watched when the water started flowing over their property in the latter part of October. He had built four or five dams by the first of November. By December, the earthen dams had partially washed out. In early December, after a heavy rain, Mary saw Vaughn about twelve feet from the fence line, watching the water flow onto the Drennons' property. On December 3, 2004, Vaughn placed the first of at least three timbers near the Drennons' property, perpendicular to the boundary line, and added more dirt.

Crocker thought Vaughn was trying to get the Drennons to do what he wanted, that is, take out trees and put in a ditch in the front. Blackwell thought Vaughn graded and terraced his property to funnel water onto the Drennons' property. Vaughn told Blackwell that he was going to push a brush pile onto the Drennons' property because he likes to agitate people

and he would like to see all his neighbors move away. Tatum testified that he thought the purpose of the levies Vaughn built was to divert water to the Drennons' backyard. Vaughn told Tatum that he wanted the Drennons' property.

Vaughn testified that he watched the Drennon property because he was looking for evidence that they were dumping sewage onto his property. He said he tilled the dirt to dispose of the sewage and big rains took the dirt away. He brought more soil in and that caused more water to drain onto the McGee and Crocker properties. When that happened, they came to Vaughn and asked him to do something to alleviate that problem. So he used his tractor and "drug backwards to where [he] could stop it temporary until [he] could fill it all back in." He started putting dams in because his property was eroding. He put the timbers behind the Drennons' property, perpendicular to his boundary line, because that was the only place that was eroding. Vaughn said there was enough room for the water to slow down around the timbers and travel down to a point where it would not go onto the Drennons' property. When he put the timbers in to hold the dirt, McGee and Crocker no longer had problems.

Vaughn received a letter from the Drennons' lawyer in November informing him that his actions adversely affected them. Vaughn said he never intended to leave the dams permanently. He did not remove them because the injunction, which was entered on December 7, prohibited him from removing them. He said he did not intend to put dirt on the gate or to harass the Drennons. Vaughn admitted that his dams altered the flow of water. Vaughn denied flooding anyone. He said God flooded them. He denied deliberately forcing the water to go onto the Drennons' property. He admitted that he put in the timbers after he received the letter from the Drennons' attorney.

### Discussion

There was testimony that Vaughn wanted his neighbors to move away, that he wanted the Drennons' property for himself, and that he was unhappy because the Drennons would not put in drainage ditches in front of their house. At the time Vaughn bought his property, there were drainage ditches and pipes draining excess water from the Drennons' property. Vaughn removed a pipe, failed to maintain the ditch at the back of the Drennons' property, cleared and tilled the land behind the Drennons' property, and built four or five earthen dams supported by timbers. At that point, the Drennons experienced damaging flooding they had never before experienced in the three decades they had owned the property.

Vaughn had lived there for several years and was aware of the natural flow of water and the drainage problems. He kept watch over the Drennon property and therefore knew how much water flowed into and traveled through their yard. After McGee and Crocker complained about drainage from his property, he attempted to correct the problem. After he received written notice from the Drennons, through their attorney, that his actions were detrimental to them and they wanted him to stop, he reinforced the dams with timbers and more dirt. He did not attempt to correct the problem affecting their land. Several witnesses testified that these fortified dams forced water onto the Drennons' property.

Vaughn denied any intent to harm the Drennons, explaining that he moved soil to clear the power right of way, to stop erosion on his property, to till under sewage, and to avoid causing excess drainage onto the McGee and Crocker properties. His reason for building the dams is a disputed

fact that the trial court could have reasonably resolved against Vaughn. *See Garza,* 164 S.W.3d at 627. The trial court could have found Vaughn's testimony about his intent to have been incredible. *See City of Keller,* 168 S.W.3d at 822. The record presents clear and convincing evidence that could produce in the mind of the trier of fact a firm belief or conviction that Vaughn desired to cause flooding by use of the dams or that flooding was substantially certain to result supporting a finding of malice. *See Copelin,* 689 S.W.2d at 406.

Furthermore, if Vaughn's explanation is believed, he attempted to protect McGee and Crocker, as well as his own property, at the Drennons' expense. The evidence is sufficient to show his acts involved an extreme degree of risk of harm to the Drennons, of which Vaughn had actual, subjective awareness, and yet he proceeded with conscious indifference to their rights, safety, and welfare supporting a finding of gross negligence. *See Boatman v. Lites,* 970 S.W.2d 41, 46 (Tex.App.-Tyler 1998, no pet.) (Defendants, although informed that their action in diverting surface water caused damage to plaintiffs' property, did not refrain from diverting water and were liable for exemplary damages.); *Bily v. Omni Equities, Inc.,* 731 S.W.2d 606, 614 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (Defendant who was aware his conduct blocked drainage and intentionally permitted impounding to continue was liable for punitive damages.). The evidence is sufficient to produce in the mind of the trier of fact a firm belief or conviction that the harm suffered by the Drennons resulted from malice or gross negligence. *See Garza,* 164 S.W.3d at 627. We overrule the Vaughns' eighth issue.

#### CONCLUSION

Because there is no evidence to support any cause of action against Barbara Vaughn, we reverse the injunctions and actual and punitive damage awards against her and render a take nothing judgment as to Barbara Vaughn. The injunctions from threatening or harassing the Drennons, coming within seventy five feet of the Drennons at any time, communicating with the Drennons in any manner, destroying, disposing of, or altering any prior communication with the Drennons, and disturbing the peace of the Drennons cannot be founded in any theory the Drennons pleaded or proved. We delete these injunctions from the judgment. The trial court did not err by ordering Millard Vaughn to alter the slope of his property. However, because the order does not clearly describe the corrective measures Millard Vaughn is required to implement, we reverse the trial court's order requiring him to lower the elevation of his land and remand the cause to give the trial court the opportunity to clarify. In all other respects, we affirm the trial court's judgment.