# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00059-CV

**Courey International, Appellant**

**v.**

**Designer Floors of Texas, Inc., Appellee**

## FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY, NO. C-1-CV-04-276274, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Courey International ("Courey") sued appellee Designer Floors of Texas, Inc. ("Designer Floors") for failure to pay half of the amount owed on a container of laminate. Designer Floors counterclaimed that Courey had provided defective vinyl and composition tile in two other shipments, for which Designer Floors had paid in full. At the bench trial, the parties stipulated that Designer Floors owed Courey for the amount due on the laminate and tried the counterclaim to the trial court. The trial court found for Designer Floors on the counterclaim, awarded damages, and ordered Courey to retrieve the remaining tile from the warehouse of Designer Floors. In eleven points of error on appeal, Courey argues that the evidence was legally and factually insufficient to show that the tile was defective and properly rejected by Designer Floors, that the court exceeded its authority in ordering Courey to retrieve the tile, and that Courey is owed the amount due for the laminate and attorney's fees. We affirm the judgment of the trial court.

**BACKGROUND**

Designer Floors ordered two containers of vinyl and composition tile from Courey. According to the testimony of Donna Dixon,[1] a partner at Designer Floors who oversees the administrative side of the business, the first container of tile was ordered in November 2002 and arrived on April 30, 2003. The second container of tile was ordered in January 2003 and arrived before the first container, on April 11, 2003. Designer Floors also ordered a container of laminate, which arrived on May 12, 2003. Designer Floors paid Courey for the two containers of tile and made a payment for half of the amount due on the container of laminate.

In May 2003, Designer Floors began providing the Courey tile to subcontractors for installation. Donna Dixon testified that, within 30 days of the initial installations, Designer Floors began receiving warranty complaints from its customers indicating that the tile was "popping up" and "cupping" due to a failure to adhere to the surface beneath it.[2] Designer Floors handled the first inquiries without contacting Courey, instead sending its subcontractors to correct the work. However, additional customer complaints regarding installations of Courey tile arrived, coupled with assertions from the subcontractors that they had done nothing wrong during the initial installations. Designer Floors alerted Steve Poska, a Courey representative, about a possible defect in the tile roughly two months after the initial installations. Designer Floors also contacted Erik Nordstrom

_____

[1] As the only two witnesses in this case, Donna Dixon and Michael Dixon, have the same last name, they will be referred to by their full names throughout this opinion. The facts recited herein are from their testimony and the exhibits admitted at trial.

[2] In addition to the adhesion problems, Michael Dixon testified that each of the pieces of Courey tile exhibited a small imprint in the same shape as a cutout found on the boxes used to ship and store the tile.

of Quickstyle, a Courey distributor based in San Antonio, who along with Poska had met with Designer Floors during initial negotiations regarding purchase of Courey tile.

Courey representatives recommended that Designer Floors use a different kind of adhesive when installing Courey tile. Michael Dixon, the president and co-owner of Designer Floors, testified that he felt that the type of adhesive recommended by Courey was improper. To test this advice, Designer Floors arranged with Courey to perform a special installation at Colony Square, a location requiring a tile reinstallation due to problems with Courey tile. At Colony Square, Designer Floors reinstalled Courey tile in two units, using standard adhesive in one unit and adhesive recommended by Courey in the other. Although Designer Floors had planned for Courey to attend the installation, no representatives from Courey showed up on the agreed-upon day of the reinstallation. The reinstalled Courey tile failed to adhere in either unit, "popping up" and "cupping" regardless of the adhesive used. Four days later, Designer Floors replaced the tile in the Colony Square units with tile from another manufacturer, receiving no complaints about the new tile.

In addition to consulting with Courey directly, Designer Floors also met with Nordstrom to discuss the problems with the Courey tile. Nordstrom inspected installations where the Courey tile was "popping up" and "cupping," and Designer Floors performed a test at its office for Nordstrom illustrating the adherence problems with the Courey tile.

After discovering the issues with the Courey tile, Designer Floors performed numerous tile reinstallations with a different brand of tile. These installations occurred between July and October of 2003. The reinstallations were done with the same adhesive that had originally been used with the Courey tile, and in some cases the work was performed by the same subcontractor who

3

had originally installed the Courey tile. Designer Floors received no complaints about the reinstallations.

On October 23, 2003, Designer Floors sent a fax to Nordstrom which stated that "a decision was made to discontinue selling the [Courey] Capri tile. We have had problems with installation of this material and we have also had feedback about installation from people doing their own." After indicating the amount of Courey tile still in stock, the fax stated, "We would like to have the inventory picked up and be reimbursed for what we have and the warranty issues." Donna Dixon also sent an email to Nordstrom on December 3, 2003, again detailing the inventory of Courey tile and stating, "We will accept a credit up to the amount that we owe Courey [for the laminate] but will need a check on the remainder of the balance due us. We are still getting calls regarding this tile and I expect that we will continue to get them." Donna Dixon testified that Courey offered to give Designer Floors a credit for the tile remaining in the warehouse, but that no credit has been forthcoming.

Courey filed a suit on a sworn account to recover the unpaid balance on the container of laminate. Designer Floors counterclaimed for breach of contract due to delivery of defective tile. At trial, Courey and Designer Floors stipulated that Designer Floors had not paid Courey for half of the container of laminate. In presenting its counterclaim, Designer Floors offered the testimony of Donna and Michael Dixon, along with documents reflecting the locations, dates, and cost of the reinstallations and copies of the fax and email sent to Nordstrom. Courey offered no witnesses or evidence in defending itself against the counterclaim. The trial court found for Designer Floors on the counterclaim and entered judgment ordering Courey to pay Designer Floors $27,246.64, a total equaling the amount paid for the remaining Courey tile that Designer Floors had in its inventory, the

4

cost of making warranty replacements for Courey tile that had already been installed, interest, and attorney's fees, minus the amount owed to Courey for the laminate. The court also ordered Courey to retrieve the remaining tile from the warehouse of Designer Floors. This appeal followed.[3]

## STANDARD OF REVIEW

When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain the appellants' legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable

---

[3] As a preliminary matter, we address the joint motion of Courey and Designer Floors to correct the clerk's record by stipulation. According to the parties' joint motion, the trial court's findings of fact and conclusions of law contain certain unintended inaccuracies that are inconsistent with the court's judgment. Specifically, conclusions of law numbers two and three incorrectly state that appellant Courey, and not appellee Designer Floors, is entitled to attorney's fees. In addition, although the trial court's sixth finding of fact states that Courey owes Designer Floors interest, there is no corresponding conclusion of law regarding interest. The parties agree that conclusions of law numbers two and three should be deemed to award attorney's fees to appellee Designer Floors and that finding of fact number six should be deemed to conclude as a matter of law that interest is awarded as found. We grant the joint motion of the parties and order that the record be amended to reflect the parties' stipulations.

and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When considering a factual-sufficiency challenge, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either standard of review, we must be mindful that the trial court as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.). The trial court may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.

We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although appellants may not challenge a trial court's conclusions of law for factual sufficiency, we may review the trial court's legal conclusions drawn from the facts to determine whether the conclusions are correct. *Id.*

## DISCUSSION

*Applicability of UCC*

Courey appeals from the trial court's finding in favor of Designer Floors on its counterclaim that Courey breached its contract by supplying defective tile. Here, the underlying transaction involves the sale of goods, an area which is governed by the Uniform Commercial Code (UCC). *See* Tex. Bus. & Com. Code Ann. § 2.102 (West 2009); *SelecTouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.) ("Contracts relating to the sale of

6

goods are governed by article two of the Uniform Commercial Code (UCC), adopted in Texas as chapter two of the business and commerce code."). Texas courts have consistently recognized that, "[w]here the UCC applies, common-law rules of law regarding breach of contract do not apply." *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 236 (Tex. App.—San Antonio 2001, pet. denied); *see also id.* (explaining that UCC applies to contract for sale of goods even when parties "treat[] th[e] case as a common law breach of contract and breach of warranty case"). Accordingly, we will apply the UCC when analyzing the trial court's rulings on the counterclaim of Designer Floors.

*Defective Tile*

In points of error one and two, Courey argues that there is legally and factually insufficient evidence that the tile was defective. Under the UCC, a good is "defective" for purposes of rejection or revocation when it fails to conform to the contract between the parties. *See SelecTouch*, 111 S.W.3d at 834; *see also Leggett & Platt, Inc. v. Yankee Candle Co.*, No. 4:06-CV-366-Y, 2008 U.S. Dist. LEXIS 21499, at *17 (N.D. Tex. Mar. 17, 2008) ("A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach-of-contract remedies for delivery of nonconforming or defective goods under section 2.711 of the UCC.") (internal citations and punctuation marks omitted). In determining whether the goods fail to conform to the contract between the parties, we examine the terms of the contract. *Printing Ctr. of Texas, Inc. v. Supermind Publ'g Co.*, 669 S.W.2d 779, 784 (Tex. App.—Houston [14th Dist.] 1984, no writ.). Under the UCC, "a warranty that the goods shall be merchantable is implied in a contract for their

7

sale if their seller is a merchant with respect to goods of that kind."[4]  Tex. Bus. & Com. Code Ann. § 2.314(a) (West 2009); *see also Printing Ctr.*, 669 S.W.2d at 784-85 (treating implied warranty of merchantability as contractual term in breach of contract case).  Merchantable goods are those that "are fit for the ordinary purpose for which such goods are used."  Tex. Bus. & Com. Code Ann. § 2.314(b)(3).

At trial, Designer Floors presented evidence that the Courey tile was nonconforming due to its lack of suitability for its ordinary purpose.  Designer Floors offered the testimony of Donna and Michael Dixon, who discussed two specific defects in the tile: its failure to adhere to the surface below it, resulting in its "popping up" and "cupping," and the presence of an imprint on each piece of tile in the same shape as a cutout in the shipping boxes.  Donna Dixon recounted the complaints that she received regarding installations of Courey tile and the lack of similar complaints when another brand of tile was used (even when other elements such as the adhesive and subcontractor performing the installation were the same).  She also discussed the test installation Designer Floors arranged to determine whether the adhesive was the cause of the "popping up" and "cupping" of the Courey tile.  In addition, Michael Dixon, who has 30 years' experience in flooring, testified regarding the procedures used to choose and install the adhesives employed by Designer Floors, and detailed the small imprint conforming to a cutout on the shipping materials found on each piece of

---

[4] We address the implied warranty of merchantability only as a term of the contract. We note that breach of warranty and breach of contract are distinct causes of action with separate remedies. *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991).  However, while "warranty is a distinct claim, it is nonetheless a part of the basis of a bargain and is contractual in nature." *Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008). Consequently, we look to the implied warranty to determine the terms of the agreement underlying the breach of contract claim in this case.

tile.[5] Michael Dixon explained that he had taken samples from 270 of the more than 2,300 boxes of remaining tile, and that almost each piece of tile in the selected boxes demonstrated the imprint.

The evidence presented by Designer Floors is sufficient to support a finding that the goods were defective and thereby failed to conform to the contract between the parties. Absent evidence that the implied warranty of merchantability was excluded or modified, *see id.* § 2.314(a), we read the term into the sale agreement. In this case, there is evidence that the tile was not suitable for its ordinary purpose, violating the implied warranty of merchantability. *See id.* § 2.314(b)(3). Consequently, the trial court did not err in finding that the tile was "defective" for purposes of the UCC.

Courey, however, argues that the evidence presented by Designer Floors was nonetheless insufficient to show a defect in the tile. First, Courey argues that the evidence was insufficient because Designer Floors failed to provide evidence of a *specific* defect in the tile. However, the trial testimony of Donna and Michael Dixon clearly points out specific defects in the tile, including its failure to adhere and the presence of an imprint on almost every piece of tile.

Next, Courey argues that the evidence of defect was insufficient because Designer Floors failed to offer evidence of the condition of the tile when delivered or the manner in which it was stored. In a case involving the implied warranty of merchantability, "an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense." Tex. Bus. & Com. Code Ann. § 2.314 cmt. 13. However, Courey has

---

[5] During his testimony, Michael Dixon described the imperfection: "When you look at this tile, you can shadow it. You can see that there's an imprint in the middle of the tile. It's the same one that's the imprint in the top of that box there, that piece of cardboard that's cut out."

offered no such evidence here. The testimony at trial establishes that the tile was kept in the warehouse of Designer Floors, and there is no evidence in the record that the storage conditions caused or could have caused the particular defects in the tile. In addition, the record offers no indication that Designer Floors mishandled the tile during installation. Indeed, the record demonstrates that Designer Floors made a substantial effort to compensate for the defects in the tile by switching adhesives, only to find that the problems remained.

Finally, Courey argues that the evidence was insufficient because Designer Floors did not offer expert testimony regarding the defects. However, expert testimony was not required to prove the defects at issue in this case.[6] Texas courts have recognized that, in an action for breach of contract under the UCC, lay testimony may be used to show a product's defect or nonconformity. *See, e.g.*, *SelecTouch*, 111 S.W.3d at 837-38. In *SelecTouch*, the trial court properly considered the lay testimony of a company president who "had worked with electronics most of his adult life" in determining whether electronic switch panels were improperly manufactured. *See id.* (holding that

_____

[6] Courey relies on products liability jurisprudence for the proposition that expert testimony is required to show a defect in the tile. While expert testimony may sometimes be required in products liability cases, a "defect" in goods for the purposes of the UCC "is not the same as the defect in a strict products liability case." *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989) (explaining that products liability "defect" requires showing of dangerousness, unlike UCC); *see also Dell, Inc. v. Muniz*, 163 S.W.3d 177, 182 n.6 (Tex. App.—San Antonio 2005, no pet.) (indicating that in context of UCC "a 'defect' has been construed as a condition of the goods that renders them unfit for the ordinary purpose for which they are used because of a lack of something necessary for adequacy") (citations and quotation marks omitted)). Further, even in the products liability field, expert testimony is not always required to prove a defect: "On a subject matter in which the fact finder would not be required to be guided solely by the opinion testimony of experts, lay testimony may be permitted" in a products liability case. *Sipes v. General Motors Corp.*, 946 S.W.2d 143, 155 (Tex. App.—Texarkana 1997, pet. denied).

court had discretion not only to consider lay testimony but to favor lay testimony over expert testimony).

The evidence presented by Designer Floors would allow a reasonable and fair-minded person to conclude that the tile was defective, and the evidence is not so weak that the finding is clearly wrong and unjust. Accordingly, the evidence that the tile was defective is legally and factually sufficient. Courey's first and second points of error are overruled.

*Rejection of Tile*

In points of error three and four, Courey argues that there is legally and factually insufficient evidence to support the trial court's finding that Designer Floors provided adequate notice of rejection of the defective floor tile in a timely manner. Under the business and commerce code, a buyer accepts goods if he agrees to accept them despite their nonconformity, fails to make an effective rejection, or does any act inconsistent with the seller's ownership. Tex. Bus. & Com. Code Ann. § 2.606 (West 2009). "Rejection of goods must be within a reasonable time after their delivery," and the buyer must seasonably notify the seller of the rejection. *Id.* § 2.602(a). Where a buyer accepts goods without knowledge of a non-conformity, the buyer may revoke its acceptance if acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. *Id.* § 2.608(a)(2). Revocation of goods produces the same rights and duties with regard to the goods as rejection. *Id.* § 2.608(c).

Whether rejection or revocation of acceptance "occurred within a reasonable time depends on the facts of a particular case." *Id.* § 1.205(a); *see also Toshiba Mach. Co. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 772 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). As the inquiry is highly fact-specific, results vary widely from case to case. *Compare*

11

*EPN-Delaval, S.A. v. Inter-Equip, Inc.*, 542 F. Supp. 238, 248 (S.D. Tex. 1982) (explaining that, under Texas law, 65 days may not constitute "reasonable time" when nonconformity is "total and blatant"), *with Toshiba*, 180 S.W.3d at 772 (explaining that buyer has not necessarily accepted goods as matter of law even after 17,000 hours of use over four years). Notice of rejection must be clear and unambiguous, and "mere notice that goods are nonconforming is not sufficient notice of rejection or revocation of acceptance." *Emerson Elec. Co. v. American Permanent Ware Co.*, 201 S.W.3d 301, 311 (Tex. App.—Dallas 2006, no pet.)

In this case, the tile was delivered in April 2003. Designer Floors began sending the Courey tile out for installation in May 2003, receiving the first customer complaints about the tile within 30 days of the first installations. Designer Floors corrected some of the problems before contacting Courey about the issues. Courey responded by advising Designer Floors to change the kind of adhesive used with the Courey tile, but did not attend the special installation that had been arranged to test the alternate adhesive. According to the testimony of Donna Dixon, after Designer Floors notified Courey of mounting customer complaints regarding the Courey tile, Courey "told us just to fix things and they would take care of it." Designer Floors performed reinstallations with a different brand of tile between July and October of 2003, and sent a fax requesting a refund on the remaining Courey tile to Nordstrom on October 23, 2003.

These facts support a finding that the notice of defect provided by Designer Floors was given within a reasonable time. The difficulty in ascertaining the defect combined with the steps Designer Floors took to cure the defect (or allow Courey to do so) indicate that the interim between delivery and rejection was reasonable. In addition, these facts support a finding that Courey provided clear and unambiguous notice to the seller. The fax sent to Nordstrom on October 23, 2003

12

clearly states that the Courey tile was defective and that Designer Floors sought a refund for the unused tile. Though Nordstrom worked for Quickstyle, he had participated in the initial sale of the Courey tile along with Poska, a Courey employee. Further, Donna Dixon testified that Nordstrom and Poska "had the same information about the defects." She further testified that Courey offered Designer Floors a credit on the tile remaining in the warehouse, but never followed through on such a promise.

Courey also argues that Designer Floors exercised dominion over the tile, thereby waiving its rights to reject or revoke the goods. A buyer is prevented from rejecting goods or revoking acceptance only if the buyer accepts the goods "with knowledge of a non-conformity." Tex. Bus. & Com. Code § 2.607(b) (West 2009). Further, Texas courts have rejected the argument that use, even after discovery of nonconformity, equals irrevocable acceptance. *See Toshiba*, 180 S.W.3d at 772. Instead, whether the buyer's use of goods precludes rejection or revocation of acceptance depends upon whether the use was reasonable, and "what constitutes reasonable use is a question of fact to be decided under the circumstances of each case." *See id.* In this case, Designer Floors reasonably used the tile in its initial installations, and stopped installing the tile after confirming the defects in the goods. The remaining tile was simply stored in their warehouse. Consequently, they retained the rights regarding rejection and revocation of the defective goods.

Together, these facts would allow a reasonable and fair-minded person to conclude that Designer Floors properly rejected or revoked acceptance of the nonconforming tile, and the evidence is not so weak that the finding is clearly wrong and unjust. Accordingly, Courey's third and fourth points of error are overruled.

13

*Expenditures for Warranty Replacements*

In points of error five and six, Courey argues that there is legally and factually insufficient evidence to support the trial court's finding that Designer Floors was forced to expend $7,166.14 in warranty work to replace defective floor tile for its customers. Designer Floors presented the testimony of Donna Dixon, who detailed the dates of the warranty replacements made by Designer Floors between July and October of 2003 and the costs of the replacements. The court also admitted into evidence a chart made by Donna Dixon detailing thirteen warranty replacements of Courey tile as well as invoices for each of the warranty replacements.

This evidence would allow a reasonable and fair-minded person to conclude that Designer Floors spent $7,166.14 on warranty replacements of the Courey tile and is not so weak that the finding is clearly wrong and unjust. Accordingly, the evidence is legally and factually sufficient. Courey's fifth and sixth points of error are overruled.

*Order Requiring Removal of the Tile*

In points of error seven and eight, Courey argues that there is legally and factually insufficient evidence to support the trial court's order that Courey remove the tile from the premises of Designer Floors. A statutory county court has the power to grant equitable relief. Tex. Gov't Code Ann. § 26.050 (West 2004) (authorizing county courts to "grant any relief that may be granted by a court of law or equity"), .051 (authorizing county courts to grant writs, including writs of mandamus and injunction). Courts retain their equitable powers even in cases involving the UCC: "The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it[s]

14

provisions in many important ways." Tex. Bus. & Com. Code Ann. § 1.103 cmt. 2 (West 2009). Accordingly, "principles of common law and equity may supplement provisions of the Uniform Commercial Code," provided such principles are not "inconsistent with either [the UCC's] provisions or its purposes and policies." *Id.* As "[t]he granting or denial of equitable relief lies within the sound discretion of the trial court," *Fleetwood v. Med Ctr. Bank*, 786 S.W.2d 550, 556 (Tex. App.—Austin 1990, writ denied), such determinations are subject to an abuse of discretion standard of review on appeal. *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no pet.).

In this case, Courey argues that the damages awarded by the trial court constitute an adequate remedy at law, and therefore no basis exists for the trial court's order requiring Courey to remove the tile from the premises of Designer Floors. The damages awarded by the trial court, however, relate to the receipt and use of defective goods, not to the ongoing storage or disposal of such goods. Further, while the UCC imposes on the buyer "a duty after rejection to hold [the rejected goods] with reasonable care at the seller's disposition for a time sufficient for the seller to remove them," Tex. Bus. & Com. Code Ann. § 2.602(b)(2), the UCC neither imposes an obligation on the buyer to return the goods to the seller nor provides a means for the buyer to require the seller to remove the goods. *See id.* § 2.711 (enumerating buyer's remedies for breach of contract under UCC). Accordingly, the evidence that Courey delivered defective goods to Designer Floors and that those goods remain within the storage facilities of Designer Floors is sufficient to support the equitable order of the trial court ordering the goods removed. As the court's order is supported by

15

the evidence and did not constitute a clear abuse of discretion, Courey's seventh and eighth points of error are overruled.

*Adequacy of Pleadings*

In point of error nine, Courey argues that the trial court's order mandating removal of the defective tile from the warehouse of Designer Floors was not supported by the pleadings because Designer Floors did not specifically request such relief. However, under Texas law, "[w]hen a plaintiff has included a general prayer for relief, the propriety of a remedy depends not on the specific relief sought but on the facts pleaded and proven." *Holmstrom v. Lee*, 26 S.W.3d 526, 532-33 (Tex. App.—Austin 2000, no pet.).[7] In such cases, the court may grant relief consistent with the facts proven at trial, provided the result does not enlarge the pleadings to include a different cause of action for which fair notice does not exist. *See Stoner v. Thompson*, 578 S.W.2d 679, 683 (Tex. 1979).

In this case, Designer Floors included a general request for relief in its prayer, requesting "such other and further relief to which it may be justly entitled." The pleadings assert that Courey breached its contract by delivering defective tile to Designer Floors, and Designer Floors produced legally and factually sufficient evidence at trial that such defective tile was delivered and stored in its warehouse. Accordingly, an order requiring removal of the defective tile underlying the breach of contract claim is supported by the pleadings and the facts proven at trial. Courey's ninth point of error is overruled.

---

[7] Relief under a general prayer may be granted even if, as here, a party has also requested specific relief. *See Vaughn v. Drennon*, 202 S.W.3d 308, 314 (Tex. App.—Tyler 2006, pet. denied)

*Effect of a Take-Nothing Judgment on the Counterclaim*

In point of error ten, Courey argues that a take-nothing judgment on the counterclaim of Designer Floors compels a judgment for Courey and an award of attorney's fees.  As we affirm the judgment of the lower court, we need not reach this issue.

## CONCLUSION

Because we find no reversible error, we affirm the judgment of the trial court.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   January 15, 2010