# NO. 12-21-00090-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN RE:  BELLA CORP. D/B/A BROADWAY POWERSPORTS AND BRADLEY WATSON, RELATORS* | § § § | *ORIGINAL PROCEEDING* |

## *OPINION*

Relators Bella Corp. d/b/a Broadway Powersports and Bradley Watson filed this original proceeding to challenge Respondent's order granting net worth discovery.[1]  We conditionally grant the writ.

## BACKGROUND

Real Parties in Interest J. Greenberg Limited Partnership and Trisis Properties, L.L.C. (RPIs) sued Relators for trespass to real property, unjust enrichment, private nuisance, negligence, negligence per se, and aiding and abetting based on allegations that Relators allowed their customers to test drive vehicles and parked on the RPIs' neighboring land, and showcased merchandise on the RPIs' land without permission.  They sought a temporary injunction, a permanent injunction, and damages, including exemplary damages.  An agreed temporary injunction was signed on November 18, 2019.  The RPIs subsequently amended their petition to allege that Relators installed a commercial wash pit that drained wastewater onto the RPIs' property.

In November 2020, the RPIs filed a motion for net worth discovery.  On June 3, 2021, Respondent granted the motion and ordered the discovery due by June 18.  Relators filed this

---

[1] Respondent is the Honorable Austin R. Jackson, Judge of the 114th District Court in Smith County, Texas.

original proceeding on June 15 and this Court granted their request for a stay of Respondent's order.

**PREREQUISITES TO MANDAMUS**

Mandamus will issue to correct a discovery order if the order constitutes a clear abuse of discretion and there is no adequate remedy by appeal. *See **In re Daisy Mfg. Co.***, 17 S.W.3d 654, 658 (Tex. 2000) (orig. proceeding) (per curiam). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. ***Walker v. Packer***, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the facts. *Id*. at 840. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in mandamus. *Id*. The relator has the burden to establish the prerequisites to mandamus. ***In re Fitzgerald***, 429 S.W.3d 886, 891 (Tex. App.—Tyler 2014, orig. proceeding).

**ADEQUATE REMEDY**

The RPIs contend that Relators failed to show lack of an adequate remedy by appeal. They maintain that Relators will not be harmed by production of net worth discovery because a protective order is in place and net worth discovery will only be presented to the jury in the second phase of trial should the jury find liability.

However, "[m]andamus relief is available when the trial court compels production beyond the permissible bounds of discovery." ***In re Weekly Homes, L.P.***, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding). Whether Respondent ordered net worth discovery within the scope of the civil practice and remedies code may be reviewed by mandamus. *See **In re Boone***, No. 04-20-00219-CV, 2020 WL 3815921, at *1 (Tex. App.—San Antonio July 8, 2020, orig. proceeding) (op.) (mandamus review of net worth discovery order); *see also **In re Daybreak Cmty. Servs. Tex., LLC***, No. 10-19-00395-CV, 2020 WL 958457, at *1 (Tex. App.—Waco Feb. 26, 2020, orig. proceeding) (mem. op.) (same); ***In re Islamorada Fish Co. Tex., LLC***, 319 S.W.3d 908, 910 (Tex. App.—Dallas 2010, orig. proceeding) (op. on reh'g) (same).

2

## ABUSE OF DISCRETION

Relators contend that Respondent abused his discretion by granting net worth discovery because the RPIs failed to demonstrate an entitlement to the discovery.

## Applicable Law

"[I]n cases in which punitive or exemplary damages may be awarded, parties may discover and offer evidence of a defendant's net worth." *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988), *disapproved of on other grounds by Walker*, 827 S.W.2d at 842. Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2015).

For discovery purposes, however, on a party's motion and after notice and a hearing, a trial court may authorize discovery of a defendant's net worth if the court finds in a written order that the claimant demonstrated a *substantial likelihood of success on the merits* of a claim for exemplary damages. *Id*. § 41.0115(a) (West Supp. 2020). Accordingly, the statute's plain language makes clear that the movant seeking net worth discovery need only show a substantial likelihood of success on the merits, not clear and convincing evidence, to be entitled to net worth discovery.[2] *See id*.; *see also ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (when construing a statute, we give effect to the Legislature's intent, which requires us to first look to the statute's plain language). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain,* success." *Schiavo ex. Rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005); *see* BLACK'S LAW DICTIONARY 947

---

[2] In reliance on a Texas Court of Criminal Appeals opinion, the RPIs maintain that mandamus review is improper because the evidentiary standard is a "legal issue of first impression that is neither positively commanded nor plainly prescribed." Assuming that case applies to civil proceedings, the court of criminal appeals also stated, "Mandamus relief is inappropriate if the law surrounding the court's action is *unclear*." *State ex rel. Wice v. Fifth Judicial Dist. Court of Appeals*, 581 S.W.3d 189, 194 (Tex. Crim. App. 2018) (emphasis added). The San Antonio appellate court has evaluated a net worth discovery challenge and in doing so, addressed whether the movant established, by clear and convincing evidence, the elements of gross negligence. *See In re Boone*, No. 04-20-00219-CV, 2020 WL 3815921, at *2 (Tex. App.—San Antonio July 8, 2020, orig. proceeding) (op.). But the statute's plain language clearly calls for application of the substantial likelihood of success on the merits standard. Based on that plain language, we conclude that the evidentiary standard surrounding Respondent's action is not unclear and mandamus is appropriate. *See Wice*, 581 S.W.3d at 194 ("even an issue of first impression can qualify for mandamus relief when the principle of law is so plainly prescribed as to be free from doubt").

(8th ed. 2004) (likelihood of success on the merits requires that the moving party "show a reasonable probability of success in the litigation or appeal").

If exemplary or punitive damages clearly are not recoverable, net worth information is not relevant and, consequently, not discoverable. *Islamorada*, 319 S.W.3d at 912. When reviewing an order authorizing or denying discovery of net worth evidence, we consider only the evidence submitted by the parties in support of or in opposition to the motion.[3] TEX. CIV. PRAC. & REM. CODE ANN. § 41.0115(c).

**Evidence**

The RPIs own the Greenberg North and South Tracts. Watson and his wife own Bella, which owned the neighboring Bella Tract until it sold the property to Heath Hicks in 2019, after which it leased the property from Hicks. Broadway Powersports, owned by Bella, operated a business on the Bella Tract, which included the sale of off-road vehicles. As previously stated, the RPIs complain of unauthorized activity by Relators on the Greenberg Tracts, including driving, parking, and showcasing merchandise on the South Tract and using a "wash pit" that drained onto the North Tract.

According to Watson's deposition, he and his wife each own fifty percent of Bella and Watson oversees operations, "ordering primarily, inventory." He was at Broadway Powersports almost daily. Regarding injuries, he recalled a lawsuit involving a Yamaha vehicle and a rollover in which Broadway Powersports was named as a defendant. As for the wash pit, he explained that the pit appeared to extend past the boundary line, a fact he did not notice until later. He stated, "…when they did it, I didn't realize it was going to roll out like that. I didn't know they were going to roll it out like that." As for the test driving, when Watson spoke to employee Jonathan Hitt about the South Tract, Hitt did not recall taking anyone up the track. Watson identified a particular area "where we were okay with people driving the units … for test

---

[3] The RPIs maintain that we should consider both evidence presented in the motion for discovery and response and evidence presented regarding Relators' no evidence summary judgment motion on exemplary damages. At the discovery hearing, Relators' counsel argued that it may be beneficial for Respondent to decide the summary judgment before deciding the discovery motion. The RPIs' counsel had no objection. Respondent ruled on the summary judgment motion before ruling on the discovery motion. The discovery order states that Respondent reviewed the RPIs' motion, responses thereto, replies (if any), and oral arguments (if any) in reaching his decision. The record does not reveal that Respondent considered the summary judgment evidence when ruling on the discovery motion, but even so, Section 41.0115(c) expressly limits our review to evidence submitted by the parties in support of or in opposition to the motion for net worth discovery. TEX. CIV. PRAC. & REM. CODE ANN. § 41.0115(c) (West Supp. 2020). Accordingly, we will limit our review to the discovery evidence in accordance with the statute.

driving," which included Greenberg property. He added that customers were allowed to test drive on "what we now understand" to be the Greenberg property. Watson did not see customers or employees driving off-road very often, and not at all after the RPIs' request to stay off the property.

In another deposition, Tray Whiteside, a former Bella employee, testified that Bella mechanics drove on the South Tract during his employ and this activity probably began before his employment. He never asked the mechanics if they had permission to drive on the South Tract. He also drove on the South Tract and assumed it was okay to do so. In 2009 or 2010, he stopped allowing employees to drive on the South Tract after a Broadway Powersports service technician had an accident on the South Tract. He did not want employees driving on the tract because of the dirt, erosion, and safety issues. He acknowledged that someone could be hurt. He later learned that "they didn't want anybody over there."

In his declaration, Sam Greenberg averred that he never gave Watson, Bella, or anyone associated with them, permission to use the Greenberg tracts to park vehicles, test drive vehicles, or drain wastewater/chemicals. But he has seen Bella employees and customers park on the South Tract and showcase merchandise on the South Tract, and he has seen the off-road trails that run from the Bella Tract though the South Tract. Sam explained that the trails are consistent with off-road tracks of the type of vehicles sold by Relators and that no one associated with the RPIs created the trails. The declaration incorporates a photograph, which Sam states depicts three vehicles, none of which belong to the RPIs, parked on the South Tract. He contacted law enforcement to warn Bella and its employees off the land; he saw the officer enter the building and speak with a Bella representative. Sam states that the "trespasses" caused erosion of soil because the off-road vehicles turn the soil into fine sand and destroy the vegetation. He did not feel comfortable entering the property, knowing someone else may be on the property without permission. He especially felt this way after seeing a photograph on Broadway Powersports' website, which depicted an employee seated on a vehicle and "wielding firearms on the Greenberg Land." Sam explained that the trespass caused annoyance, mental anguish, and discomfort because of the knowledge that Relators used the property without permission and someone could be harmed by the unauthorized activity. According to Sam, the trespassing continued despite two cease and desist letters and calls to law enforcement to warn Relators' employees off the Greenberg property. He explained that, after filing the lawsuit, he learned that

5

Relators "secretly" operated a commercial wash pit that used the North Tract "as a dumping ground for wastewater and sludge." Sam installed cameras, which caught video footage of Relators' employees draining wastewater, debris, and chemical sludge onto the North Tract.

In his declaration, Michael J. Collins stated that he went to Broadway Powersports on August 28, 2019, and encountered a trailer and several trucks on the South Tract. It was apparent to him that the equipment and trucks belonged to Bella employees or other people at Broadway Powersports. On September 3, he returned to Broadway Powersports and the salesman, Hitt, offered a test drive. Hitt rode with Collins and directed Collins to drive "over in the dirt behind the cars," which Collins knew to be the South Tract. Collins stated, "so it was clear he was directing me to drive further into the Greenberg South Tract." He drove the vehicle partially up the South Tract's slope. Collins test drove a second vehicle, with Hitt riding along, also driving onto the South Tract.

Attorney Jon Rowan stated in his declaration that he sent a letter to Bella and Watson on the RPIs' behalf, which instructed them to immediately cease and desist from using Greenberg land. Specifically, a letter dated September 19, 2017 states:

> It has come to our attention that you are trespassing upon my clients' properties for the purposes of offering vehicles for sale and conducting illegal and inappropriate "test drives", amongst possibly other things. The Greenberg interests therefore demand that you immediately cease such activities and any other activity on my clients' properties, and desist from such activity in the future, and comply with other requirements set forth in this letter.
>
> …
>
> The continued use by you and your business of my client's Properties creates an unsafe situation and causes damage to my clients' real property.
>
> Therefore, The Greenberg interests demand that Bella Corp., Broadway Powersports, its employees, clients and owners immediately cease and desist from all further use of my clients' properties for any purposes. Additionally, my clients demand that you warn any employees, invited guests, and others to abide by these demands.
>
> My client further demands that you provide a written confirmation to my clients[] stating your intention to change your policy with respect to "test drives" and any continued use of my clients' property by the close of business on September 27, 2017. Any failure or delay in complying with these demands will likely compound the damages for which you may be liable. If my clients do not receive a timely and satisfactory response, they are prepared to use all remedies available, including the filing of a civil lawsuit to restrain these actions, compensate for damages and reimburse out of pocket expenses including attorneys' fees without further notice to you. I will also advise my client to contact the local authorities to report this behavior should it continue to occur.

The letter further states that Rowan informed Watson "several years ago" that the RPIs owned the properties to the south and north and have owned these properties the entire time that Watson operated his business. Rowan states that he followed up with a telephone call to Watson reiterating that he must stop using Greenberg land. He sent a second letter to Bella and Watson to again instruct that they refrain from entering Greenberg land for any reason. That letter, dated November 9, 2017, referenced a telephone conversation between Watson and Rowan regarding activity on the Greenberg property. The letter states:

> Pursuant to our conversation, and in an attempt to avoid any confusion in the future, you are to refrain from entering upon the Greenberg property for any reason whatsoever at any time. Safety is of utmost concern for my client and any entry onto this property will compromise these safeties and will be unacceptable.

In response to Greenberg's requests for admission, Relators admitted that the RPIs own the Greenberg land, Bella has parked vehicles on the South Tract, and Bella customers have test driven vehicles and/or equipment on the South Tract. Also, in 2018, Watson made an offer to purchase a portion of the South Tract, but the RPIs declined to sell the property.

In his affidavit attached to Relators' response to the motion for discovery, Watson stated that he is an authorized representative and shareholder of Bella, who leased or owned the Bella Tract during the relevant time period. Watson stated that he did not individually own or lease the Bella Tract, have any employees, customers, or merchandise, or use the Greenberg property; rather, his involvement in the properties and claims at issue is limited to his role as a principal of Bella. He explained that the concrete pavement, trough, and metal grate (wash pit) was designed and constructed to level the area to allow crates to be stacked and to allow Bella's forklift to be safely operated in that area. Before this installation, crates could not be safely stacked and the forklift could not be safely operated. Vehicles are also rinsed in that area. Watson acknowledged that the rinse water drains onto the North Tract, but stated that it was not apparent to him or to Bella that washing the vehicles on the Bella Tract could adversely affect the North Tract and there was no visible indication that the washing had any adverse affect on the North Tract. According to Watson, the washing activity ceased on or about January 13, 2020. Watson also stated that an employee injury occurred in approximately 2010, but he was unaware of any customers being injured during a test drive.

7

The RPIs' experts, Donny Hearn and Leslie Jeske, offered their declarations regarding the damage done to the Greenberg Tracts. Hearn and Jeske each opined that the operation and use of the wash pit contaminated the North Tract because of the purposeful discharge of wastewater and solid-state sludge residue associated with cleaning, degreasing, and removing sediment, fuel, oil, grease, and other unknown substances from various vehicles, and by the application of solvents to perform these cleaning and degreasing activities. Hearn explained as follows:

> The following Chemicals of Concern or "COCs" were found in the soil samples taken from the Greenberg North Tract immediately below the commercial wash pit and in the direct downstream path of the waste water flowing from the commercial wash pit: TPH C6-C12, TPH >C12-C28, TPH >C28-C35, Benzene, Ethylbenzene, Toluene, Trimethylbenzene (1, 2, 4-), Trimethybenzene (1, 3, 5-), Xylene (o-), Xylenes (total), and Benzo(a)pyrene. These COCs were at levels exceeding both the respective critical Tier 1 Commercial/Industrial Soil PCL and the critical Tier 1 Residential Soil PCL. Naphthalene was found in the same area at levels exceeding critical Tier 1 Residential Soil PCL. In plain English, the soil on the Greenberg Land has been contaminated, and the source of that contamination is the commercial wash pit on the Bella Tract.

Jeske's declaration virtually mirrors this explanation. He adds that use of the wash pit caused significant erosion to the creek bank that runs through the North Tract. He stated that damages measured by the costs of proper remediation of the North Tract total over $200,000. Jeske further opined that the destruction to the South Tract's vegetation, along with significant destabilization and soil erosion, is consistent with the continuous use of off-road utility vehicles. The cost of remediation totaled $68,000 to $75,000. James Justice, a licensed real estate appraiser, provided a declaration stating that the diminution in value to the North Tract resulting from contamination totals $507,763.36. He further opined that the diminution in value to the North Track resulting from erosion caused by ATV traffic totals $172,578.16.

In Relators' designation of expert witnesses, they state that Dr. Victoria Harkins, a professional engineer, was expected to testify (1) to minor TPH contamination that has already demonstrated natural degradation and will continue to degrade naturally with time, (2) that contamination is limited to "less than a 10' squared area;" any additional contamination is not reasonably expected to be larger than five feet horizontally and two feet vertically; (3) that remediation by introduction of a bio-amendment can be completed for $9,390; (4) that the volume of water discharged from washing activities is insufficient to cause erosion or creek bed damage on the North Tract; and (5) that the damage to the South Tract, if any, allegedly caused

8

by Relators could be remedied for $3,335 by application of hydromulch, but that this was unnecessary because the area would revegetate naturally. Relators anticipated that Joe Bill Thompson, a real estate appraiser, would testify that the diminution in market value to the North Tract associated with alleged contamination is $140,000 and there is no diminution in value to the South Tract.[4]

**Analysis**

The question before us is whether the RPIs demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages; specifically, whether the RPIs presented some evidence of fraud, malice, or gross negligence. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 41.0115(a), 41.003(a). In their motion for net worth discovery, the RPIs argued that Relators' conduct met the standards for malice and gross negligence.[5]

We first address malice. Malice constitutes a specific intent by the defendant to cause substantial injury or harm to the claimant. *Id*. § 41.001(7) (West Supp. 2020). "Specific intent means that the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Vaughn v. Drennon*, 202 S.W.3d 308, 321 (Tex. App.—Tyler 2006, no pet.). Malice may be proven by direct or circumstantial evidence. *Id*. at 322. A corporation is liable for exemplary damages only if it (1) authorizes or ratifies an agent's malice, (2) maliciously hires an unfit agent, or (3) acts with malice through a vice principal. *Qwest Int'l Commc'n, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005).

---

[4] Relators argue that evidence predating the applicable statute of limitations cannot be considered, i.e., evidence of actions before September 2017. This would include evidence such as the employee injury in 2010, Whiteside's testimony to actions that occurred before September 2017, and the photograph of the employee holding firearms. But given our disposition of this proceeding, we need not address this contention.

[5] The RPIs contend that mandamus should be denied because granting relief would require us to address the following disputed areas of fact: (1) whether Relators had the requisite intent for malice; (2) whether Relators had the requisite intent for gross negligence; (3) the extent and level of danger involved with Relators' test-driving activities on the South Tract; and (4) the extent and level of danger involved with Relators' use of the commercial wash pit that discharged contaminated water onto the North Tract. An appellate court may not deal with disputed areas of fact in an original mandamus proceeding. *In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (orig. proceeding). It is within the trial court's province to resolve matters regarding witness credibility and the weight to be assigned the evidence. *See In re Walton*, No. 11-16-00230-CV, 2017 WL 922418, at *2 (Tex. App.—Eastland Feb. 28, 2017, orig. proceeding) (mem. op.); *In re M.C.W.*, 401 S.W.3d 906, 907 (Tex. App.—Amarillo 2013, orig. proceeding) (per curiam). "If the record contains legally sufficient evidence both against and in support of the trial court's decision, then mandamus will not lie because weighing conflicting evidence is a trial court function." *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 686 (Tex. 2007) (orig. proceeding) (Johnson, J., dissenting); *see also Walton*, 2017 WL 922418, at *1. Thus, we will not disturb Respondent's ruling so long as it is supported by the evidence.

Relators contend there is no evidence to support a finding of specific intent on the part of Relators or anyone associated with them. The RPIs argue the following evidence supports specific intent: "(1) Relators had actual knowledge of their boundary line but used the Greenberg Land anyway; (2) the Greenberg Family repeatedly told Relators to stop using the Greenberg Land; (3) Relators wished to purchase the Greenberg Land but the Greenberg Family refused to sell to them; and (4) Relators continued their conduct despite (1), (2), and (3)." The RPIs maintain that Bella authorized and ratified the actions of its employees and customers because it knew the test drives and washing activities were occurring and was put on notice by Rowan's letters, but continued authorizing the activities, took no action against employees and no action to stop customers, accepted the activities and profited from sales secured by illegal test drives, and benefitted from the washing activities. They further maintain that Bella's vice-principals committed malicious and grossly negligent acts, arguing that Watson, Whiteside, and Adam Ward, another Bella employee, are all vice-principals.

There is evidence from which Respondent could reasonably conclude that Watson is a vice-principal. *See **Mobil Oil Corp. v. Ellender***, 968 S.W.2d 917, 922 (Tex. 1998) ("Vice principal" encompasses corporate officers, those with authority to employ, direct, and discharge servants of the master, those engaged in the performance of nondelegable or absolute duties of the master, and those to whom the master has confided the management of the whole or a department or a division of the business). Watson acknowledged that he oversees operations, owns fifty percent of Bella, and was at Broadway Powersports almost daily. The pertinent record does not speak to Ward's duties, but does contain some indication that Whiteside may have acted in a managerial capacity.

And we agree that the pertinent record contains evidence showing that the RPIs own the Greenberg Tracts, Relators were aware of the RPIs' ownership and the boundary lines, Relators admitted that customers test drove on the Greenberg Tracts and equipment was parked on Greenberg land, Relators were told to stop using the Greenberg Tracts, but the activities continued despite warnings from law enforcement and the RPIs' counsel, and the activities on the Greenberg Tracts caused some damage. The record also contains evidence that Relators were advised that their continued activities on the Greenberg Tracts "creates an unsafe situation and causes damage to [the RPIs'] real property" and that "entry onto this property will compromise these safeties and will be unacceptable."

10

But none of this evidence establishes that Relators desired the consequences of any unauthorized activities on the Greenberg Tracts, i.e., erosion and contamination of the land or injury to others, or that they believed such consequences to be substantially certain to result from their actions. Rowan's letters did not identify the types of harm or injury that Relators' activities allegedly caused; thus, the letters did not place Relators on notice that their actions were causing substantial damage to the land itself. Regarding the wash pit, Respondent was free to disbelieve Watson's statements that he did not realize it would "roll out like that" and that an adverse affect was not apparent. Even so, there is no evidence that Relators built and used the wash pit with any desire to contaminate the North Tract or with any belief that contamination was substantially certain. *See c.f.* ***Vaughn***, 202 S.W.3d at 323-24 (Vaughn wanted Drennons to move, wanted their property for himself, and was unhappy with the Drennons' refusal to install drainage ditches in front of their house; evidence showed Vaughn desired to cause flooding by use of dams or that flooding was substantially certain to result); *c.f.* ***Withrow v. Armstrong***, No. 10-05-00320-CV, 2006 WL 3317714, at *5 (Tex. App.—Waco Nov. 15, 2006, pet. denied) (mem. op.) (Withrow disliked Armstrong and inserted poison into tree's roots with specific intent of damaging tree in order to cause substantial injury to Armstrong; "Withrow's conduct was certainly not designed to promote some good purpose, but was initiated with 'complete disregard' for Armstrong's property rights and with the intent of damaging her neighbor's property").

And while the types of vehicles sold by Relators, such as all-terrain vehicles, may be considered dangerous, that fact is not evidence of a specific intent to cause substantial injury or harm to anyone driving on, parked on, or present on the South Tract. This is particularly true given that the record contains evidence of only two vehicle-related injuries that occurred over the several years in which Bella operated Broadway Powersports. Common sense dictates that driving an all-terrain type vehicle on the South Tract would cause some disturbance to the soil or some damage to the vegetation, but the record is simply devoid of evidence reflecting that Relators desired to cause substantial erosion to the tune of thousands in remediation costs, or believed such consequences to be substantially certain. *See c.f.* ***Wilen v. Falkenstein***, 191 S.W.3d 791, 802 (Tex. App.—Fort Worth 2006, pet. denied) ("that Wilen knew Falkenstein did not want Wilen's tree service to trim his tree, that Wilen knew Falkenstein was out of town on vacation, and that Wilen knew Falkenstein wanted to take care of his own trees, but nonetheless

11

directed his tree service to enter Falkenstein's property and cut five feet off a tree that was obstructing Wilen's view—is evidence of ill-will, spite, and a specific intent on the part of Wilen to cause substantial injury to Falkenstein"); *c.f. Holubec v. Brandenberger*, 214 S.W.3d 650, 652 (Tex. App.—Austin 2006, no pet.) (nuisance created by Holubecs was severe enough to force Brandenbergers from home, Holubecs were aware of nuisance's severity but took no action to alleviate it, Holubecs denied the existence of conditions and circumstances that a reasonable fact finder would not find debatable, evidence showed Holubecs knowingly exacerbated nuisance due to ill-will and litigation between parties).

Nor is Watson's failed attempt to purchase a portion of Greenberg land demonstrative of specific intent. Beyond mere speculation, the record contains no evidence from which it could be inferred that Relators' activities continued in retaliation for the failed purchase. *See c.f. Vaughn*, 202 S.W.3d at 323-24. And speculation is not evidence. *Hurley v. Tarrant County*, 232 S.W.3d 781, 787 (Tex. App.—Fort Worth 2007, no pet.); *see Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 437 (Tex. 1997) ("Speculation cannot create a fact issue"); *see also McKinney Ave. Prop. No. 2, Ltd. v. Branch Bank & Trust Co.*, No. 05-14-00206-CV, 2015 WL 3549877, at *9 (Tex. App.—Dallas June 5, 2015, no pet.) (mem. op.) (while party is entitled to reasonable inferences from evidence, party cannot create fact issue based on mere speculation); *Univ. of Tex. at El Paso v. Muro*, 341 S.W.3d 1, 5 (Tex. App.—El Paso 2009, no pet.) ("When circumstantial evidence is so slight that the choice between opposing plausible inferences amounts to nothing more than speculation, it is legally no evidence at all.").

There is simply no evidence in the pertinent record to demonstrate a specific intent by Relators, in any capacity, to cause substantial injury or harm to the RPIs. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7); *c.f. Bennett v. Reynolds*, 315 S.W.3d 867, 884-85 (Tex. 2010) (vice principal used corporate authority to direct corporate employees, on corporation time and land, to load neighbor's cattle and sell them at auction, while using corporate equipment to convert the cattle; thus, the Corporation authorized the doing and manner of the conversion, and vice principal's conduct was chargeable to the Corporation for purposes of exemplary damages). Accordingly, Respondent could not reasonably conclude that the RPIs demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages based on malice. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.0115(a).

We now address gross negligence, which means an act or omission:

12

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id*. § 41.001(11). Under the objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. ***U-Haul Int'l, Inc. v. Waldrip***, 380 S.W.3d 118, 137 (Tex. 2012). The subjective prong, in turn, requires that the defendant knew about the risk, but the defendant's acts or omissions demonstrated indifference to the consequences of its acts. *Id*. Like malice, gross negligence may be proven by direct or circumstantial evidence. ***Vaughn***, 202 S.W.3d at 322. "A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence." ***Ellender***, 968 S.W.2d at 921. As with malice, a corporation may be so liable if it authorizes or ratifies an agent's gross negligence, is grossly negligent in hiring an unfit agent, or commits gross negligence through the actions or inactions of a vice principal. *Id*. at 921-22.

Regarding the objective component, Relators contend that the RPIs' "evidence doesn't show that objectively, from Bella's perspective at the time, there was any likelihood of the [RPIs'] serious injury from the powerwash run-off, any test drives, or anything else the [RPIs] accuse." The RPIs maintain that test driving off-road vehicles over the South Tract's uneven terrain, including operating mowing equipment while brandishing firearms, and discharging wastewater onto the North Tract involve an extreme degree of risk.

It is axiomatic that there is some danger in driving an off-road vehicle on unimproved terrain, but "[t]here is a difference between 'not very safe' and a risk so great as to make it highly probable that harm would follow." ***City of Dalhart v. Latham***, 476 S.W.3d 103, 109 (Tex. App.—Amarillo 2015, pet. denied). Evidence of two accidents over several years simply does not equate with an inordinately risky act or omission. *See **Medina v. Zuniga***, 593 S.W.3d 238, 249 (Tex. 2019) ("while pedestrian traffic was not negligible, we also cannot conclude that driving through the parking lot at unsafe speeds at the day and time in question, while certainly risky, would pose an *extreme* risk as contemplated by the objective component of gross negligence"). The same is true of sitting on a stationary vehicle holding unloaded handguns; there is no evidence the vehicle was in motion. The pertinent evidence, as it stands, merely gives

rise to a remote possibility of harm resulting from the off-road driving. And a remote possibility is insufficient to create an extreme risk. *See Waldrip*, 380 S.W.3d at 137.

Nor is there evidence that the wash pit involved an extreme degree of risk. While washing and rinsing vehicles, causing chemicals to wash onto the North Tract may be negligent, it does not give rise to the type of serious risk that satisfies the gross negligence standard. *See c.f. Boatman v. Lites,* 970 S.W.2d 41, 46 (Tex. App.—Tyler 1998, no pet.) ("destruction of a sizable portion of real property by erosion was, objectively, serious harm, and [] the diversion of surface waters by the Boatmans constituted an extreme danger that that particular harm would occur"); *see Terminix, Inc. v. Right Away Foods Corp.,* 771 S.W.2d 675, 680-681 (Tex. App.—Corpus Christi 1989, writ denied) (use of twice the normal quantity of poison during fumigation, creating conditions favorable to corrosion in warehouse, and failure to adequately instruct personnel on how to protect equipment from poison did not amount to evidence of gross negligence). Relators' continued activities on the property, after being told to cease and desist because of safety and damages issues, is certainly careless and thoughtless. But a merely thoughtless, careless, or not inordinately risky act or omission cannot be grossly negligent. *See Medina*, 593 S.W.3d at 249 ("[g]ross negligence can be supported only by an *extreme* degree of risk").

Based on the pertinent record, we conclude that there is no evidence of an act or omission, which when viewed objectively from Relators' standpoint at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(A). Absent evidence of this objective component, we need not address the subjective component. *See Medina*, 593 S.W.3d at 250. Respondent could not reasonably find that the RPIs demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages based on gross negligence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.0115(a).

## DISPOSITION

Having determined that no evidence supports a finding of substantial likelihood of success on the merits of an exemplary damages claim, we conclude that Respondent abused his discretion by granting the RPIs' motion for net worth discovery. Accordingly, we conditionally grant Relators' petition for writ of mandamus. We direct Respondent to vacate his June 3, 2021

order granting net worth discovery. We trust Respondent will promptly comply with this opinion and order. The writ will issue only if the trial court fails to do so *within ten days of the date of the opinion and order*. The trial court shall furnish this Court, within the time of compliance with this Court's opinion and order, a certified copy of the order evidencing such compliance. We *lift* our stay of June 15, 2021.

**BRIAN HOYLE**
Justice

Opinion delivered August 18, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# <u>ORDER</u>

**AUGUST 18, 2021**

**NO. 12-21-00090-CV**

**BELLA CORP. D/B/A BROADWAY POWERSPORTS
AND BRADLEY WATSON,**
Relators
V.

**HON. AUSTIN R. JACKSON,**
Respondent

---

### ORIGINAL PROCEEDING

---

ON THIS DAY came to be heard the petition for writ of mandamus filed by Bella Corp. d/b/a Broadway Powersports and Bradley Watson; who are the relators in appellate cause number 12-21-00090-CV and the defendants in trial court cause number 19-2303-B, pending on the docket of the 114th Judicial District Court of Smith County, Texas. Said petition for writ of mandamus having been filed herein on June 15, 2021, and the same having been duly considered, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby **conditionally granted**.

And because it is further the opinion of this Court that the trial judge will act promptly and vacate his order granting net worth discovery of June 3, 2021; the writ will not issue unless the **HONORABLE AUSTIN R. JACKSON** fails to comply with this Court's order within ten (10) days from the date of this order.

By *memorandum* opinion.
*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*

16